2007-NMCA-076

160 P.3d 923

George **ALBIN,** as personal representative of the Estate of John Albin, on behalf of himself and all others similarly situated, **Plaintiff–Appellant,**

v.

Nicholas S. **BAKAS,** Frank R. Taylor, John Denko, Carlos R. Maldanado, and C.S. Hooper and Dennis O'Leary, on behalf of themselves and all other similarly situated defendants, **Defendants–Appellees.**

No. 26,134.

Court of Appeals of New Mexico.

April 26, 2007.

Certiorari Denied, No. 30,417, June 14, 2007.

Kennedy & Oliver, P.C., Joseph P. Kennedy, Albuquerque, NM, for Appellant.

French & Associates, P.C., Stephen G. French, Valerie A. Chang, Albuquerque, NM, for Appellees.

## OPINION

VIGIL, Judge.

{1} The issue presented in this case is whether state police officers who seize cash under the authority of the Controlled Substances Act, NMSA 1978, §§ 30–31–1 to –41 (1972, as amended through 2006), are required to comply with the requirements of the Forfeiture Act, NMSA 1978, §§ 31–27–1 to –8 (2002), or whether they may instead transfer the cash to the federal government to bring a forfeiture action under federal law, then receive from the federal government a portion of the proceeds. We conclude that compliance with the Forfeiture Act is mandatory and reverse the summary judgment granted to Defendants.

## HISTORY

{2} On October 20, 2002, New Mexico State Police Officer Hooper stopped a vehicle that was speeding on Highway 54 between Logan, New Mexico and Tucumcari, New Mexico. As Officer Hooper approached the vehicle and Driver rolled down his window, Officer Hooper smelled what he recognized to be burnt marijuana coming from inside the vehicle. Officer Hooper learned that both Driver and Passenger had Missouri driver's licenses, and that the vehicle was rented to Passenger in Kansas City, Missouri.

{3} Officer Hooper asked Driver to exit the vehicle so he could issue him a speeding citation, and when he did, Officer Hooper smelled the odor of burnt marijuana coming from his person. Driver said he wanted to plead guilty to the speeding citation and pay the fine by mail. While Officer Hooper was writing the citation, he asked Driver about his travel plans, and Driver said he was going to Phoenix, Arizona to visit his son and would return to Missouri in a couple of days, and that Passenger was going to Phoenix to visit a grandchild.

{4} Officer Hooper then went back to the vehicle to verify the VIN number on the windshield and the NADAR sticker on the side of the driver's door, and while he was doing so, asked Passenger about his travel plans. Passenger said he was going to Phoenix, Arizona to visit a female named Mae whose last name he did not know, who had just gotten married. Officer Hooper again smelled the odor of burnt marijuana coming from inside the vehicle.

{5} His suspicion aroused, Officer Hooper continued to detain Driver and Passenger. In response to Officer Hooper's questions, Driver denied carrying over $10,000 in cash, or having any weapons or narcotics in the vehicle. When Officer Hooper asked Driver

for permission to search the vehicle, Driver said he could not, but did give permission to search his own personal belongings. Officer Hooper then turned his attention to Passenger who also denied having large amounts of cash over $10,000, weapons, narcotics, marijuana, cocaine, heroin, or methamphetamine. Officer Hooper then asked Passenger for permission to search the vehicle, and Passenger consented.

{6} After finding a small black bag under the passenger seat with rolling papers and a roach clip burned on the end which smelled like marijuana, Officer Hooper asked Passenger where the rest of the marijuana was, and Passenger removed a plastic bag of marijuana from his shoe. Continuing his search into the trunk, Officer Hooper found a nine-inch hunting knife and a backpack which contained hallucinogenic mushrooms (psilocybin), marijuana paraphernalia, 18 Xanax pills in a pill bottle with the label removed, and $23,100 in cash, which was divided into five bundles wrapped with rubber bands. Officer Hooper arrested Driver and Passenger and transported them and the evidence to the New Mexico State Police office in Tucumcari, New Mexico, where he met with Agent Carr, who is a narcotics agent with the New Mexico State police.

{7} At the Tucumcari State Police office, Agent Carr spoke with Officer Hooper, counted the cash, and completed a New Mexico State Police seizure form, which stated that the cash was seized from Passenger, its owner, by Officer Hooper and Agent Carr. Agent Carr then contacted the United States Drug Enforcement Administration (DEA) "to pursue seizure of the currency," and placed the cash "in evidence for safekeeping until a decision on procedure could be made." The cash "was later transported to the Albuquerque Narcotics office for storage until [the] Narcotics Evidence Custodian[ ] could retrieve it."

{8} The next day, October 21, 2002, a criminal complaint was filed in the Quay County Magistrate Court, alleging that Passenger committed misdemeanor offenses related to his possession of the drugs, drug paraphernalia, and knife. The charges were disposed of in a plea and disposition agreement approved by the magistrate court on July 15, 2003. Passenger pleaded no contest to one misdemeanor count of possession of a controlled substance, and the rest of the charges were dismissed. He received a deferred sentence of 364 days. *See* NMSA 1978, § 31–20–3 (1985) (providing that upon entry of a judgment of conviction, the court may enter an order deferring the imposition of sentence); NMSA 1978, § 31–20–9 (1977) (providing that when the period of deferment expires, the defendant has satisfied his criminal liability for the crime, and the court shall enter a dismissal of the criminal charges).

{9} The record does not show what happened with the cash from the time it was seized on October 20, 2002, and transported to the State Police Albuquerque narcotics office for storage until November 12, 2002. At that time, a cashier's check was issued to the United States Marshal Service in the amount of $23,100, showing that the remitter was the New Mexico State Police. While the check was issued on November 12, 2002, the DEA did not approve adoption of the forfeiture of the $23,100 until November 27, 2002, and the New Mexico State Police "receipt record" shows that the United States Marshal Service did not take actual possession of the check until December 3, 2002. On May 7, 2003, while the criminal charges against Passenger were still pending, the United States filed a complaint in the United States District Court for the District of New Mexico, naming the cash as the defendant and Passenger as a claimant, seeking forfeiture of the cash to the United States pursuant to federal law. Passenger subsequently died, and the forfeiture action continued against the currency as the defendant and Passenger's personal representative as the claimant of the currency. The United States District Court ultimately entered a judgment forfeiting the interest of Passenger's estate in the $23,100 to the United States.

{10} Passenger's personal representative (Plaintiff) then sued Officer Hooper, Agent Carr, and their superiors, the Chief of the New Mexico State Police, and the Secretary of the Department of Public Safety (Defendants) under the New Mexico Tort Claims Act, NMSA 1978, §§ 41–4–1 to –27 (1976, as

amended through 2006), asserting that the New Mexico State Police violated the Forfeiture Act when they transferred the cash to the federal government. The district court granted summary judgment in favor of Defendants, and this appeal followed. We reverse.

## STANDARD OF REVIEW

{11} Defendants are entitled to summary judgment if "there is no genuine issue as to any material fact" and if they are "entitled to a judgment as a matter of law." Rule 1–056(C) NMRA. The parties do not dispute the material facts. Rather, they dispute the applicability of the Forfeiture Act. Because this case also requires us to determine whether provisions of the Forfeiture Act are applicable and whether they were violated, our review is de novo. *Ramirez v. IBP Prepared Foods*, 2001–NMCA–036, ¶ 10, 130 N.M. 559, 28 P.3d 1100 ("Interpretation of statutory language is a question of law that this Court reviews de novo.").

## DISCUSSION

{12} The issues in this case arise because it is alleged that state police officers seized Passenger's cash under the authority of state law, and instead of complying with procedures mandated by state law related to the care, custody, control, and disposition of the cash, delivered the cash to federal officers for forfeiture under federal law. We therefore begin our analysis with whether the summary judgment record establishes any violations of state law.

{13} Property is subject to forfeiture when it is associated in various ways with violations of the Controlled Substances Act, Section 30–31–34, including specifically "money which is a fruit or instrumentality of the crime." Section 30–31–34(F). Further, the Controlled Substances Act states that the Forfeiture Act applies to the "seizure, forfeiture and disposal" of property that is subject to forfeiture under the provisions of the Controlled Substances Act. Section 30–31–35. In this case, the record before us establishes that when Officer Hooper discovered the drugs, drug paraphernalia, and cash, he arrested Driver and Passenger and charged them with violating drug offenses under the Controlled Substances Act. The cash was seized by Officer Hooper and then detained by Agent Carr under, and pursuant to, the Controlled Substances Act, making its "seizure, forfeiture and disposal" subject to the provisions of the Forfeiture Act.

## Violations of the Forfeiture Act

{14} The parties do not contest whether the initial seizure of the cash violated the Forfeiture Act. Section 31–27–4(B)(1) of the Act states that property may be seized by a law enforcement officer without a prior court order if the property subject to forfeiture is not a residence or business when, "the seizure is incident to an arrest for a crime . . . and the law enforcement officer making the arrest . . . has probable cause to believe the property to be property subject to forfeiture and that the subject of the arrest . . . is an owner of the property." We therefore assume that Officer Hooper and Agent Carr conformed with the Act when they initially seized the cash. However, compliance with the Act ended there.

{15} The Forfeiture Act directs: "Seized currency alleged to be subject to forfeiture shall be deposited with the clerk of the district court in an interest-bearing account." Section 31–27–8(A). The statute does not require a forfeiture action to be filed to make it operative. In fact, the statute is entitled, "Safekeeping of seized property pending disposition[,]" which plainly indicates that compliance is required regardless of whether a forfeiture complaint is ultimately filed. Depositing the cash with the district court clerk as directed by the statute brings it under the direct jurisdiction and supervision of the district court. The clerk deposits the money into a trust fund checking account, which holds all money that belongs to litigants or might be refunded to litigants. NMSA 1978, § 34–6–36 (1968). The clerk is only authorized to pay money out of this account in accordance with a written order of the district court filed with the clerk. Id.

{16} Forfeitures are in rem proceedings under New Mexico law. *See State v. Nunez*, 2000–NMSC–013, ¶¶ 77–84, 129 N.M. 63, 2 P.3d 264 (stating that forfeiture relies on in rem jurisdiction over the proper-

ty itself, which allows the court to deal with the property even if the owner is not in the jurisdiction, and with property that has no owner or an unidentified owner); *Devlin v. State ex rel. N.M. State Police Dep't,* 108 N.M. 72, 73, 766 P.2d 916, 917 (1988) (stating that a forfeiture action is traditionally classified as an in rem proceeding, and in rem jurisdiction has been asserted when the court is able to exercise control over the defendant res); *In re Forfeiture of One 1980 Honda Accord,* 108 N.M. 274, 275, 771 P.2d 982, 983 (Ct.App.1988) (stating that forfeiture cases against property for violation of drugs laws are purely in rem proceedings). The effect of the legislative directive to deposit currency alleged to be subject to forfeiture into an account subject to the direct jurisdiction and supervision of the district court is that the district court acquires jurisdiction over the currency and maintains it to the exclusion of any other court, be it a state court or federal court. Since 1935, when the United States Supreme Court decided *Penn General Casualty Co. v. Pennsylvania, ex rel. Schnader,* 294 U.S. 189, 55 S.Ct. 386, 79 L.Ed. 850 (1935), it has been well settled that the court that first acquires control of the res subject to forfeiture retains exclusive jurisdiction over it to the exclusion of any other court. *Id.* at 195, 55 S.Ct. 386. In keeping with this precedent, we reject the suggestion made by Defendants that federal forfeiture statutes preempt the Forfeiture Act. Therefore, the federal court could not obtain jurisdiction over the cash unless, and until, the state district court relinquished its own jurisdiction and control of the cash. *See, e.g., United States v. One 1987 Mercedes Benz,* 2 F.3d 241, 244 (7th Cir.1993) (finding that even though no state forfeiture proceeding had commenced, the federal government had to comply with state law requiring a turnover order from the district court before the federal government could obtain jurisdiction over seized property subject to adoptive forfeiture); *Scarabin v. Drug Enforcement Admin.,* 966 F.2d 989, 995 (5th Cir.1992) (requiring the DEA to "first seek a turn over order from the state court, or wait until that court relinquishes control over the res" before proceeding with a federal forfeiture complaint); *United States v. One 1979 Chev-*

*rolet C–20 Van,* 924 F.2d 120, 122–23 (7th Cir.1991) (requiring that the federal government seek a turnover order from the state court before seizing the property in question because "[a] local police department may not take seized property and just pass it on as it pleases to the FBI in flagrant disregard of state laws mandating judicial authority for such turnovers"), *superseded by statute as stated in United States v. Sixty–Two Thousand Six Hundred Dollars,* 899 F.Supp. 378 (N.D.Ill.1995). Instead of complying with his duty to deposit the cash with the clerk of the district court, Agent Carr immediately made the decision to contact the DEA "to pursue seizure of the currency," and placed the cash "in evidence for safekeeping" until a decision was made on what procedure to follow.

{17} A second material requirement of the Forfeiture Act was subsequently violated. The Act directs: "Within thirty days of making a seizure, the state shall file a complaint of forfeiture or return the property to the person from whom it was seized." Section 31–27–5(A). Instead of filing a forfeiture complaint against the cash within thirty days, the State Police kept it in its personal custody from the time it was seized on October 20, 2002, until December 3, 2002, when the cashier's check was delivered to the United States Marshal Service. The State Police officers circumvented this additional requirement of the Forfeiture Act. If the cash had been deposited with the clerk of the district court, it would have been under the exclusive jurisdiction of the district court, with the consequence that with no state forfeiture complaint being filed with thirty days, Passenger could have petitioned the district court to order the cash returned to him. The Forfeiture Act clearly contemplates that the authority and jurisdiction to determine the status of the cash lies with the district court and not the State Police acting independently of statutory requirements.

{18} Finally, we note that by its conduct, the State Police circumvented what our Supreme Court requires in *Nunez:* if the State wanted to seek forfeiture of the cash, it was required to do so in Passenger's criminal case. "[H]enceforth, all forfeiture complaints and criminal charges for violations of the

Controlled Substances Act may both be brought only in a single, bifurcated proceeding." 2000–NMSC–013, ¶ 104.

{19} We conclude that the summary judgment record establishes that the Forfeiture Act was violated. Defendants contend, and the district court apparently agreed, that they were not required to comply with the Forfeiture Act. We now turn to Defendants' arguments.

### Defendants' Arguments

{20} The cash was turned over to the federal government to pursue an "adoptive seizure." *Johnson v. Johnson*, 849 P.2d 1361, 1363 (Alaska 1993) describes this process as follows:

> Through informal arrangements, local police departments agree to notify the DEA when they seize property which may be subject to forfeiture pursuant to federal narcotics laws. Upon a DEA request, the local police department will transfer the property to the DEA, which will treat the property as if it had been seized by federal authorities. That is, the DEA will "adopt" the seizure. The DEA will then institute federal forfeiture proceedings against the property. Once the forfeiture is complete, the DEA is authorized to "split the pot" with the cooperating local police department.

Similar descriptions of an "adoptive seizure" from various sources are collected in *Cavaliere v. Town of North Beach*, 101 Md.App. 319, 646 A.2d 1058, 1060 (Md.Ct. Spec.App.1994) (noting that although not expressly authorized in the federal statutes or regulations, the United States Attorney General has permitted the DEA to "adopt" seizures made by local officials and to use federal forfeiture procedures with respect to that property as part of a cooperative effort with state and local officials to fight drugs). *See* 21 U.S.C. § 873(a)(2) (2000) (authorizing the Attorney General of the United States to cooperate with local and state agencies concerning traffic of controlled substances "in the institution and prosecution of cases in the courts of the United States"); 21 U.S.C. § 881(e)(1)(A) (2000) (authorizing the Attorney General of the United States to "trans-

fer" property forfeited in a federal action "to any State or local law enforcement agency which participated directly in the seizure or forfeiture of the property"); Internal Revenue Service Manual, 9.7.2.7.3 (07–15–2002), *available at* http://www.irs.gov/irm/part9/ch 07s02.html (stating that the state police often opt to turn over the currency to the federal government when state forfeiture law prohibits forfeiture or when it would be more advantageous to proceed under federal law).

{21} Defendants first argue that they were allowed to transfer the cash to the federal government to initiate a federal forfeiture action because, although it was seized pursuant to New Mexico law, based on a violation of the Controlled Substances Act, they were not *required* to initiate forfeiture proceedings under state law because there is no language in the statutes that renders the Forfeiture Act the *exclusive* law under which a forfeiture action may be commenced. This argument overlooks the plain, unambiguous requirement of the Forfeiture Act we have already discussed that seized currency that is alleged to be subject to forfeiture "shall be deposited with the clerk of the district court in an interest-bearing account." Section 31–27–8(A). Clearly and unambiguously, the statute requires deposit of the cash with the clerk of the district court to provide for its safekeeping under the exclusive jurisdiction of the district court.

{22} Officer Hooper stopped the vehicle under his authority as a New Mexico State Police officer for a violation of New Mexico law. His authority to detain and question Driver and Passenger, and then search the vehicle they occupied and their personal belongings, was derived exclusively from New Mexico law. Officer Hooper arrested Driver and Passenger for violations of state drug laws under the Controlled Substances Act, and they were held in custody under the authority of New Mexico law. There was no federal involvement in stopping the vehicle, in detaining, questioning and arresting Driver and Passenger, in searching the vehicle, or in seizing and detaining the cash. The cash was seized by Officer Hooper and then detained by Agent Carr under and pursuant to the Controlled Substances Act, making its

seizure, forfeiture, and disposal subject to the Forfeiture Act. Just because the officers subsequently decided to transfer the cash to the federal government for the purpose of bringing a federal forfeiture action did not entitle them to ignore New Mexico law. *See DeSantis v. State*, 384 Md. 656, 866 A.2d 143, 147–48 (2005) (concluding under substantially similar facts that the Maryland State Police "is not free to circumvent State law altogether when it decides to forgo State forfeiture proceedings in favor of federal forfeiture proceedings"). In arriving at its conclusion, the Maryland Court of Appeals also noted that almost all the cases that have considered the issue have assumed that state authorities cannot avoid their own state laws when they transfer property to the federal government. *Id.* at 148 (collecting cases). We are also in agreement with this proposition and hold that Defendants were not entitled to avoid all requirements of the Forfeiture Act merely because they intended to transfer the property to the federal government.

{23} Secondly, Defendants assert that the Forfeiture Act itself allowed them to transfer the cash to the federal government without complying with its requirements. They contend that the Forfeiture Act itself states that it applies to federal forfeiture proceedings only to the extent that the procedures set forth in the Forfeiture Act and federal forfeiture proceedings are consistent with one another. Therefore, Defendants contend, the Forfeiture Act does not apply to federal forfeiture proceedings because their procedures are not totally consistent with each other. This argument relies on the phrase "other laws" in Section 31–27–2(B)(2). We also reject this argument.

{24} In construing the Forfeiture Act, our ultimate goal is to ascertain and give effect to the intent of the Legislature, and we begin by looking at the language of the statute itself. *State v. Smith*, 2004–NMSC–032, ¶¶ 8–9, 136 N.M. 372, 98 P.3d 1022. However, we also keep in mind that "[f]orfeitures are not favored at law and statutes are to be construed strictly against forfeiture." *State v. Ozarek*, 91 N.M. 275, 275–76, 573 P.2d 209, 209–10 (1978). In its entirety, Section 31–27–2 provides:

A. The purposes of the Forfeiture Act are:

(1) to make uniform the standards and procedures for the seizure and forfeiture of *property subject to forfeiture;* and

(2) to protect the constitutional rights of persons accused of a crime and of innocent persons holding interests in *property subject to forfeiture.*

B. The Forfeiture Act applies to:

(1) seizures, forfeitures and dispositions of *property subject to forfeiture* pursuant to laws that specifically apply the Forfeiture Act; and

(2) seizures, forfeitures and dispositions of *property subject to forfeiture* pursuant to *other laws;* but only to the extent that the procedures in the Forfeiture Act for seizing, forfeiting or disposing of property are consistent with any procedures specified in those laws.

(Emphasis added.)

{25} One of the stated purposes of the Forfeiture Act is to make uniform the standards and procedures for the seizure and forfeiture of property, specifically, "property subject to forfeiture." Section 31–27–2(A)(1). As used in the Forfeiture Act, "property subject to forfeiture" means, "property described and declared to be subject to forfeiture *by a state law* outside of the Forfeiture Act." Section 31–27–3(G) (emphasis added). An example of property that satisfies this definition is found in the Controlled Substances Act at Section 30–31–34, where it describes property that it declares is subject to forfeiture. To achieve its stated objective of making the standards and procedures for the seizure and forfeiture of property uniform, the Forfeiture Act then describes what forfeiture actions it applies to.

{26} First, it applies to "seizures, forfeitures and dispositions," Section 31–27–2(B)(1), of "property described and declared to be subject to forfeiture *by a state law,*" Section 31–27–3(G), (which is to say, "property subject to forfeiture") under laws that "specifically apply the Forfeiture Act." Section 31–27–2(B)(1). A specific example, once again, is the Controlled Substances Act, which states, "The provisions of the Forfei-

ture Act ... apply to the seizure, forfeiture and disposal of property subject to forfeiture and disposal under the Controlled Substances Act." Section 30–31–35. Other examples are NMSA 1978, § 17–2–20.1 (2002) (providing that the Forfeiture Act applies to the seizure, forfeiture, and disposal of motor vehicles, firearms, and bows and arrows used as instrumentalities in the commission of various crimes relating to hunting); NMSA 1978, § 18–6–9.3 (2002) (providing that the Forfeiture Act applies to the seizure, forfeiture, and disposal of any instrument, vehicle, tool, or equipment used to violate the Cultural Properties Act); NMSA 1978, § 30–3–8.1 (2002) (providing that the Forfeiture Act applies to the seizure, forfeiture, and disposal of a motor vehicle that is used to commit the offense of shooting at or from a motor vehicle); NMSA 1978, § 30–16B–9 (2002) (providing that the Forfeiture Act applies to the seizure, forfeiture, and disposal of property subject to forfeiture under the Unauthorized Recording Act); NMSA 1978, § 30–19–10 (2002) (providing that the Forfeiture Act applies to the seizure, forfeiture, and disposal of a gambling device or other equipment that is used in gambling); NMSA 1978, § 30–45–7(B) (2002) (providing that the Forfeiture Act applies to the seizure, forfeiture, and disposal of property used to violate the Computer Crimes Act).

{27} Second, the Forfeiture Act states it applies to "seizures, forfeitures and dispositions" of "property described and declared to be subject to forfeiture *by a state law*" (which is to say, "property subject to forfeiture") under "other laws." Section 31–27–2(B)(2). In context, it is apparent that by its reference to "other laws" the Act is referring to statutes which do not "specifically apply the Forfeiture Act." An example is NMSA 1978, § 66–3–507 (1978), which provides that a motor vehicle with an altered vehicle identification number may be declared contraband and subject to forfeiture by the law enforcement agency confiscating it, but it does not specify that the procedures of the Forfeiture Act apply. *See State ex rel. Dep't of Pub. Safety v. One 1986 Peterbilt Tractor*, 1997–NMCA–050, ¶¶ 4–12, 123 N.M. 387, 940 P.2d 1182 (construing and applying Section 66–3–507). Other examples can be found at

NMSA 1978, § 25–2–6 (1982) (providing for the seizure and forfeiture of adulterated or misbranded food, but not specifying that the procedures of the Forfeiture Act apply); NMSA 1978, § 26–1–6 (1972) (providing for the seizure and forfeiture of an adulterated, misbranded or counterfeit drug, device, or cosmetic, but not specifying that the procedures of the Forfeiture Act apply); and NMSA 1978, § 77–18–2 (1999) (providing for the seizure and forfeiture or destruction of cruelly treated livestock, but not specifying that the procedures of the Forfeiture Act apply). Since those "other laws" do not specify that the procedures of the Forfeiture Act apply, it only makes sense for the statute to continue stating, as it does, that the Forfeiture Act applies "only to the extent that the procedures in the Forfeiture Act for seizing, forfeiting or disposing of property are consistent with any procedures specified in those laws." Section 31–27–2(B)(2).

{28} This brings us to the final question: Does the phrase "other laws" in the Forfeiture Act at Section 31–27–2(B)(2), also refer to federal forfeiture proceedings as Defendants contend? We conclude it does not. The Forfeiture Act only has application to "property subject to forfeiture," which is by definition property that a *state law* describes and declares to be subject to forfeiture. Section 31–27–3(B). The Forfeiture Act then states it applies first to such property that is so described and declared by a *state law* when that law specifically states that the Forfeiture Act applies. Further, declares the Forfeiture Act, it applies when "other laws" do not specifically state that the Forfeiture Act applies to property described and declared by a *state law* to be subject to forfeiture, but only to the extent that the procedures specified in the Forfeiture Act are consistent with those set forth in the "those other laws." We construe the statute strictly against forfeiture. *Ozarek*, 91 N.M. at 275, 573 P.2d at 209. The definition of "property subject to forfeiture" with its specific reference to *state law*, the structure of the statute, and its purposes lead us to conclude that the Legislature did not intend to include an adoptive seizure by the United

States under federal forfeiture statutes in the phrase "other laws" in Section 31–27–2(B)(2).

{29} We acknowledge that the use of "adoptive seizures" is apparently wide-spread and follows a long history of forfeiture collaboration between state and federal agencies. We do not address whether, to what extent, or how an "adoptive seizure" to allow a federal forfeiture to proceed may be accomplished under the Forfeiture Act. Our holding in this case is limited: when property is seized by state police officers for forfeiture, compliance with the Forfeiture Act is required even if the state intends to transfer the property to the federal government to pursue a federal forfeiture action pursuant to an "adoptive seizure." In this case, Defendants violated the Forfeiture Act.

**Other Issues**

{30} In light of our disposition, there are issues of fact about whether Defendants converted the $23,100. *See Johnson,* 849 P.2d at 1365 ("By unilaterally transferring the property without authority and in contravention of state statutes, the [c]ity committed a conversion."); *Sec. Pac. Fin. Servs. v. Signfilled Corp.,* 1998–NMCA–046, ¶ 15, 125 N.M. 38, 956 P.2d 837 ("Conversion is the unlawful exercise of dominion and control over property belonging to another in defiance of the owner's rights, or acts constituting an unauthorized and injurious use of another's property, or a wrongful detention after demand has been made."). Further, the district court granted Defendants summary judgment without addressing whether the Tort Claims Act waives immunity for Plaintiff's claims and other procedural issues. We therefore decline to address this issue, and we leave it for the district court to examine these issues on remand.

**CONCLUSION**

{31} For the foregoing reasons, we hold that New Mexico State Police officers seizing currency under State law are subject to the procedures set forth in the New Mexico Forfeiture Act. In this case, the officers violated that Act. Therefore, we reverse the summary judgment granted to Defendants and remand for further proceedings consistent with this opinion.

{32} **IT IS SO ORDERED.**

WE CONCUR: JONATHAN B. SUTIN, Chief Judge, and JAMES J. WECHSLER, Judge.